Good morning, Your Honors. Jamie Ganson on behalf of defendant appellants C.D.C.R. and Governor Newsom. I'm reserving ten minutes for rebuttal. This Court should reverse the District Court's imposition of sweeping reforms across Richard J. Donovan and the five prisons. The District Court exceeded its jurisdiction when it expanded the scope of the litigation post-judgment to encompass claims of staff misconduct that were never contemplated by the complaint, the class certification order, or the remedial plan. The Court erroneously determined that systemic reforms were justified, and it enmeshed itself in the minutia of prison operations to impose sweeping reforms that were neither necessary, narrowly drawn, nor the least intrusive means. Counsel, let me ask you first about this question of exceeding the original complaint. As I understand the District Court's rationale, in part it was that instances of retaliation and excessive force intimidate inmates and prevent them from accessing the facilities and the programs that were the focus of the original complaint, and that the new measures were required because of violations of earlier court orders. And if those rationales are factually supportable, why isn't that sufficient to permit the Court to deal with these additional problems? So a few points, Your Honor. The Court relied on anecdotal evidence for the tie, these statements from a handful of inmates that were put before the Court to say that they were worried about filing grievances, but there was no widespread dip in use of the accommodation grievance process shown. And if we even look at Richard J. Donovan, the first motion that was filed, there was no, again, no dip there. Armstrong inmates, Richard J. Donovan? Is that the, I mean, I guess I want to stop you and just say, with respect to factual findings of the District Court about the extent of the problems, do we review for clear error? Yes, Your Honor, we do. Okay. So you have a different interpretation of some of the evidence, but does that constitute clear error? Well, under the law as well, which is a legal de novo review, there has to be widespread violations to support widespread relief. So that factor comes in as well. And again, here, although we have the anecdotal evidence from a handful of inmates that submitted statements, there's no showing that that was widespread, that there was no dip that we would expect to see in the filings of grievances across class members. And in fact, class members passed that. That isn't necessarily true. So suppose the existing number of complaints has been artificially suppressed for years and there are a lot more people that would be filing, it could still be widespread, even if the statistics were not dramatically different. Even so, the burden would be on the plaintiffs to show that. And what they showed here was an issue with Richard J. Donovan, uses of force and retaliation that they alleged. But they didn't show, other than a few inmate statements, that that really had that widespread effect that would generate widespread relief. Well, but Counsel, I'm not sure you've yet answered Judge Graber's very first question, which was, if we take the District Court's factual findings as a given, and I understand you dispute them, but if we accept them for the moment, why doesn't that establish a sufficient nexus between the claims and the complaint and the relief that's been ordered? Well, this case has never been about the staff complaint process, excessive force, or retaliation. In fact, this case has always been about, at the institutional levels, structural accessibility and programming opportunities. And to the extent that the 2007, 2012, and 2014 orders extended any further, they extended over the staff accommodation or the, excuse me, the reasonable accommodation process by which inmates request accommodations, not the staff complaint process. That's an entirely different process. But the point being, if someone is entitled to request an accommodation, but they don't do so because they're afraid of being beaten or pepper sprayed, then the relief dealing with the pepper spraying and the beating is designed precisely to deal with the original problem, which is the need to request accommodations. And so it seems to me that it relates back. So the Armstrong 5 prison order is instructive here. And what the court did there is it limited itself to these, what it called undisputed statements, which again, defendants dispute that these statements were undisputed. But when it limited itself to these statements that it's trying to extrapolate prison conditions from, first of all, it's not a random selection. It's cherry picked by plaintiff's counsel. And there's just not enough of those statements statistically to draw the conclusions that the district court is drawing. For example, under Merida, this court directed that a small universe of eight people or less has a little predictive value and must be disregarded. And yet the cases, the statements cited by the district court at all five prisons were less than five. I think you're still fighting the premise here. So it seems like we're asking you to assume that the facts are as the district court said and explain why you think the relief is not appropriate at that point. And it seems like you keep going back to the facts are not what the district court said. Certainly, Your Honor. The In other words, we're asking you to assume that these violations of or activities of misconduct was widespread and so on and so forth. You have to assume that to answer the question. Certainly under that assumption, the class claims here never encompassed the type of misconduct that is alleged here. And under the recent decision here in L.A. human rights and also under Pacific Radiation, that this court doesn't have authority or any court doesn't have authority to issue an injunction based on claims that were not pled. And here, the claims that relief were sought on were not pled in the complaint. These weren't structural accommodations. These weren't policies giving equal access to programming. But the complaint, I mean, the claim in the complaint, which it was pre-Iqbal, right? It's written at a fairly high level of generality. But the complaint that's in there was or the claim that was in there was a failure to provide reasonable accommodations, right? And you can fail to provide reasonable accommodations because of the way the building's designed or, you know, as Judge Graber pointed out, because when the people ask for reasonable accommodations, you know, they're beaten or something. So again, if we accept the findings, it seems quite closely tied. So I'm... And the district court didn't necessarily say when they asked for accommodations, people are being beaten. What they did say was that there was force being used against disabled persons that wasn't necessary. And that alone, the court found enough to support the relief here. Well, at least many of the incidents that were described were of the nature of, I asked for something, hearing assistance, something, and was then pepper sprayed or beaten. So I'm not sure I understand what your characterization... So it's our position that the type of relief here is very different from what was pled and litigated in this action. Never before has this, has a district court addressed excessive force or retaliation in this action. And that's part of the problem. Even if this court did have jurisdiction to issue the relief here, the relief was too widespread and it wasn't supported by the evidence. So what we saw, and especially in the five prison motion, is that the district court relied on incompetent and sparse evidence. They limited cross-examination and they credited untested and unsigned statements out of court that were only signed by plaintiff's counsel and not the plaintiffs themselves. And they credit those as true. And where in the district court did you object to the lack of signatures on the affidavits? So more general objections were raised in the district court, both in the RJD motion and the five prison. And the district court, in the RJD motion at, excuse me, in the RJD order at ER 25, did address that the statements were not hearsay. So under Rule 103, Federal Rules of Evidence, that doesn't need to be raised again. That isn't the question that Judge Friedland asked. Did you specifically object to the district court that the affidavits were unsigned? And had you done so, that could have been remedied at the time. Did you make that specific objection? And if so, what's the record citation? Objections were raised on the fact that they were unreliable. I don't know that it went so far as to specify that the signature was the issue. But even if without that objection, this court can still review on plain error, because there was an error in accepting those statements as true. It was plain. And in combination with the due process violations, where we were limited from cross-examining these inmates about the veracity of their statements, it did affect substantial rights. And that affected the integrity of the proceedings throughout. So it really gave the district court... When you're talking about cross-examination, you're talking about the limit on the number of depositions? Cross-examination through deposition, yes. But it wasn't just a limit on the number of depositions. But, counsel, I thought that there were more depositions permitted than you actually took. Am I wrong about that? That is true, however. Well, so how can we possibly conclude that, I believe it was ten, that ten is too few when you only took four? So the problem is that the district court required the defendants to make a factual showing in order to get depositions. So to even access this discovery, defendants had to show that there was some inaccuracy in the statements. And they had only ten days to do so. And then they weren't able to make that burden on any of the depositions. And plaintiff's counsel stipulated to five. And we could only take four for reasons out of our control. Did you file something further at that point with the district court asking for clarification or to lift this requirement or to give you more time because you were having problems? The plaintiffs had refused an extension of time and they were going back and forth. That's not the question. Did you ask the district court who could overrule the plaintiffs? There was no time to, Your Honor. If the response was due and had defendants pursued that, then they wouldn't have had time, the response would have been due before they would have gotten before the court to get an answer on that. And under NLRB, the laws, the courts state that it is not proper to allow these sorts of statements absent cross-examination. And we see here that cross-examination had a great effect. Of the four depositions that were taken, the district court decided not to consider three of the inmates' testimony. So it really left defendants with one deposition to counter the remaining 176 statements. It just wasn't something that was appropriate. And in addition, most of these statements had been provided with plaintiff's reply. So as to the five prisons, there wasn't really an opportunity to act faster to try to get that information. I know at least with respect to CIW and KVSP, all of the declarations from class members that were submitted in support of those prisons' injunctive relief were submitted with the reply brief. And even then, there were only two declarations submitted. So the district court granted relief prison-wide. You were given an opportunity to respond to the reply brief, though, weren't you? Again, on reduced time, with hurdles put in front of defendants' abilities to take depositions. But even then, even if that was proper, and two inmates' statements is not sufficient under Morita to justify sweeping injunctive relief class-wide. And CIW is a good example. CIW, they imposed pepper spray reforms when there were no instances of pepper spray misuse alleged at that prison. At SADF, again, same two inmates for prison-wide relief, and those two inmates represented one-tenth of one percent of the Armstrong population. Well, that might be ground under the PLRA to narrow the injunction in certain minor respects, but I'm not sure why it would undo the entire injunction. So the other problem is that, in addition to the discovery, through cross-examination, that was limited. The sampling that the plaintiffs, that the court, excuse me, was drawing the extrapolations from were not random samples. And you cannot draw an extrapolation about prison-wide conditions from a non-random sample of a handful of inmates. That's just not how statistics work. And what we see at Richard J. Donovan was very different. Their statements were submitted, but the court disregarded evidence that defendants had taken immediate action to remedy those deficiencies. They had brought in training and made high-level staffing changes. They had, over since 2017 to 2019, taken such actions that decreased prison-wide the uses of force against inmates by over 30 percent. And that's an amount the plaintiff's expert deemed successful when it happened under their watch. CDCR also used the same methods that the plaintiff's expert touted as highly effective. This return to basic fundamentals using new management, training, mentorship, promoting accountability, all without the cameras, blanket sergeant assignments, and other reforms that were required here. And what the district court did in response to this evidence was looked at two facilities, A and D, and said, well, uses of force were still increasing there. But that was clear error. And the reason that was clear error is because on those facilities, first of all, the district court was looking at use of force numbers concerning all inmates, not just RJD inmates, or excuse me, not just Armstrong inmates. So they looked at statistics concerning all inmates to determine that certain inmates were being singled out. And in addition to that, they didn't look at the fact that the prison population was increasing. The proportion of inmates that was Armstrong inmates was also increasing. And when you take into consideration those changes in the facility numbers, the two facilities that the district court found to be increasing were actually decreasing in use of force. It seems like you have an argument that someone might agree with, but it's hard for me to see how it shows that what the district court found was clear error when there were experts who disagreed and the district court credited one set of experts over the other. Even if the district court credited the experts, the experts were looking at the same evidence. Plaintiffs' experts never entered the institutions and took any firsthand accounts on their own. They were relying on the same evidence that was before the court. Another issue is that the district court issued this prison-wide relief rather than limiting it to even facilities A and D. So there were ways these orders could be limited with respect to certain facilities or with respect to the prisons that don't meet the Moretta standard. And in here, if you look at, as I said earlier, what the court was basing all of its cited in the RJD order, or excuse me, in the five-prison order, all of the cited instances don't add up to the eight statements at a prison. So under Moretta, those should be disregarded. But even if you look at all of the Armstrong statements that were put forth, still at four prisons, it didn't meet the Moretta standard. And so the district court just took these little tidbits in the record without a significant statistical argument, without a valid statistical argument, and made these extrapolations class-wide that just can't be supported by the evidence. I think your premise is that we should only look at the Armstrong class statements and we should not be looking at the Coleman class statements. Is that part of the premise of what you're saying right now? That is part of the premise. However, even looking at all the statements, at RJD and CIW and SATA, for example, three statements were submitted concerning each prison. Two Armstrong, one Coleman. So three statements for an entire prison of injunctive relief, again, doesn't satisfy Moretta, no matter whether we look at all inmates that submitted statements or just some. And if the district court was trying to enforce its prior orders, saying... I mean, this kind of gets back to the question about why there needs to be a dip. If basically the district court is saying, there are violations, I was trying to end these kind of violations, it seems like there's evidence that this never worked and I need some more remedies for the thing I was trying to do all along. Why is that not appropriate? Because it's a different claim at issue here than was previously at issue. In the 2007 order, the district court identified an inadequate disability tracking system as the cause of the issue that they were having. And they took... to remedy that, they created institutional accountability and reforms to the accommodation request process. But the problem they found here was use of force. It's a different conduct altogether. And their reform was different as well. They didn't look to modify existing orders about disability accommodation requests to make sure that those were getting processed. But this is a different form of they're not getting processed, isn't it? If someone would have followed the process that was set up except for the fact that they were either physically or otherwise intimidated or feared being so, then I still don't understand why this isn't a remedy related to the original problem of access to accommodation and requests for accommodation. Even if inmates were not filing staff complaints, though, it does not go on to show that there was an actionable exclusion or participation from denial of services for disability accommodations that was widespread. That was just not shown. The court focused on these uses of force instead, and again drew these extrapolations that just can't be drawn from the evidence here. Could I ask you, since you mentioned the district court's reliance on the Coleman plaintiffs a moment ago, suppose we were to conclude that in the five prisons order, the district court's PLRA findings were flawed in that rather than finding that the remedy was narrowly tailored to protect the plaintiff's rights, he found that they were narrowly tailored to protect the rights of disabled inmates writ large, which includes the Coleman class, which are not plaintiffs. If we concluded that, do you have any argument that that error was prejudicial in the sense that is there any difference or is there any reason to believe that something might have been narrowly tailored to that big group of all disabled inmates and yet not be narrowly tailored to protect the rights of these plaintiffs? Well, certainly, Your Honor, the Coleman inmates is a class of mentally ill inmates, and there wasn't any showing that the hurdles that the Coleman inmates face as mentally ill inmates are the same as those physically and learning disabled inmates of the Armstrong class face. But I guess, I mean, the remedies that the court ordered, I mean, there's nothing in the record, for example, that, you know, body cameras are a useful way to protect people with mental disabilities, but they wouldn't be a useful way to protect people with other kinds of disabilities. We could go down the list of the other remedies, and it wasn't clear to me that there was really any difference. Well, there wasn't any fact-finding as to that. The court just assumed, and there was no evidence to show that it was, and it was plaintiff's burden to bring that evidence to show that link, that these are the same. Okay, but I guess, I mean, why isn't it, I mean, even if we grant you that there was an error in the articulation of the tailoring that needed to be found, it's your burden now to show that that error was prejudicial, and is there anything that you can point to that would suggest that it is? I mean, the error was prejudicial because it led to this duplicative relief. The relief that was imposed was duplicative to each other. It was duplicative to... But you could argue that if it was only based on the Armstrong. I mean, if you wanted to say body cameras are duplicative with fixed cameras, it seems like that has nothing to do with who the plaintiffs are. We do, but we also say it's not as widespread, and we say that the evidence, especially at the five prisons, where these extrapolations were improperly drawn, certainly adding in these Coleman class members to those numbers affects that analysis as well. So the district court said that the Coleman members had been basically part of the order from an earlier stage in this case. Now, it seems like you disagree with that, but I don't see anywhere where you appealed that at the time of the earlier order. Certainly, the order that included these class members that kind of rewrote the class definition was the same order that granted relief in the Armstrong 5 prison motion. And that was part of the problem, was that there was no class hearing to make sure there were appropriate class representatives for these inmates who were also being represented in the Coleman matter. But there was no... There was a one-day notice before the hearing when they discussed these things, and then the court, in the same decision, said this applies to Coleman inmates as well, which was rewriting the class definition in violation of Parsons v. Ryan. She was interpreting her earlier order, so I'm confused. I'm actually struggling a bit to find in my notes the date. But I think she was interpreting an earlier order that defined who was protected in the ARP more broadly. I believe she was looking at the Armstrong remedial plan itself. The problem is that both the plan, the class certification orders, the complaint, don't contemplate the inclusion of mentally ill inmates, and in fact exclude mentally ill inmates because they're part of another class. But if she said at the time, qualified inmate with a disability, that sounds like it includes people with mental disabilities. And yet I don't think there was an appeal at the time saying, wait a second, this goes beyond our plaintiffs. In the context of the Armstrong class, it was referring to those disabled Armstrong members as qualified inmates with disability. It was not seeking to bring in a whole new class of inmates. And if it were, the proper way of doing that would be to address the class certification order and expressly do so, and that wasn't done at the time. But you didn't say then either ask for reconsideration at the time. In fact, I think you drafted the language yourself, if I understand. That language, as I said, when you read it in context, is referring to the learning disabled and physically disabled class members. It doesn't open up this action wider than the class certification order. It just includes broad language in the plan for the sake of shorthand. But I do see I'm eating into my rebuttal time, Your Honor. You can save the rest of the time for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. I'm Gay Grunfeld representing the Armstrong class. The orders on appeal were necessary because defendants failed to comply with prior more narrow orders issued in 2007 and 2012. Those orders required defendants to stop discriminating against Armstrong class members, to implement a workable grievance procedure, and to hold the staff accountable for failure to meet their ADA obligations. Flash forward to 2020. Defendants were not complying with those prior orders or the Armstrong remedial plan. Relying on evidence from the Office of the Inspector General, which is a watchdog over CDCR and independent third party, as well as defendants' own admissions and plaintiffs' largely unrebutted expert reports, the district court found that defendants' centralized statewide accountability system was broken. Investigations into allegations of disability discrimination were incomplete and biased against incarcerated people and in favor of officers. Wardens were failing to hold staff accountable and impose discipline even in the face of overwhelming evidence of staff misconduct. And defendants were failing and choosing not to put cameras in their prisons, the majority of their prisons, including the six prisons at issue here. Counsel, I have a question about the cameras. Actually, I have more than one question about the PLRA standard, which I think of as narrow tailoring. It's different words. But the requirement for fixed cameras requires that they must be installed to cover all areas that class members have access to. And so my question to you is whether body cameras are redundant if the fixed cameras must cover all areas. Thank you, Your Honor. The district court found that they were not redundant and that they were necessary under the PLRA based on substantial and significant evidence. But why? I mean, I guess I have some difficulty understanding why, and I'm not sure what our standard of review is on that question of redundancy. Is that a factual question that we review for clear error? Is that a legal conclusion about whether the facts fit the statutory standard? I would suggest it's a clear error because the court made factual findings that body-worn cameras were necessary under these circumstances, relying on several pieces of evidence. In 2015, the OIG, looking at the high desert situation and relying on evidence from the Wisconsin Department of Corrections, urged CDCR to put body-worn cameras in high-security prisons. Mr. Vail, a distinguished correctional expert for plaintiffs who is very familiar with CDCR, also urged body-worn cameras, relying on evidence from other jurisdictions and on the fact that body-worn cameras can see into cells and they can pick up sound much better. And if the court looks at many of the declarations in this case and other evidence, including the investigative reports that Mr. Schwartz reviewed, there's always questions. What happened? Did this really happen? Body-worn cameras are necessary to know if it happened in the cell, in the Sally Port, in places, small places, blind spots. And as Mr. Schwartz said, body-worn and stationary cameras in corrections are no longer controversial. They are standard procedures. So it is our position that the district court did not clearly err in concluding that both were necessary to cure this longstanding systemic problem of accountability. But the district court's finding, and this is in the Donovan order, but I believe the five prisons order finding was similar. The court said body cameras are likely to improve investigations of misconduct and reduce the incidence of violations, which seems reasonable enough. But then the next sentence is, they are therefore necessary. And that seems like kind of a logical leap. I mean, like, there are lots of things that we might think would probably help, but why does that mean that they're necessary and satisfy the narrow tailoring requirement? Thank you, Your Honor. We read those sentences together. We believe the district court found they were necessary, and they are necessary. Again, if the Schwartz and OIG and Vail reports, and those were entirely unrebutted, by the way. Defendants didn't even notice the depositions of our experts here to pursue that. So these body-worn cameras are very effective in picking up staff misconduct and, by the way, in exonerating false accusations against staff. That actually raises another question that I had. The staff reassignment policy, part of the order is that anyone who has been accused of numerous violations must be reassigned. And why wouldn't it be more appropriate to say that anyone who has been found to have committed more than one violation be reassigned rather than simply accused? That seems a little uncomfortable. The language in the order has been modified by the remedial plan, which this court took judicial notice of, and the standard for reassignment is much narrower than what the court just read. So that's not going to be happening on the ground. In fact, there's a series of criteria that wardens are going to consider as set forth in the remedial plans that the defendants devised in this case. In some of the materials that we took judicial notice of, I couldn't tell if there really was an agreement, a full agreement between both sides on things. So is this something that actually is implemented and both sides have agreed to? Yes, Your Honor. In the five prisons remedial plan that was submitted for judicial notice and which judicial notice was taken is almost the final, and then there's an actual final remedial plan for both the five prisons and RJD that are on the docket that the court can look at on the district court docket. And those are the remedial plans that are in place and modify the language of the orders. Does that include the five-year retention policy versus indefinite retention of the footage? Yes, Your Honor. Okay. I guess I understood, and we can ask your opposing counsel, but I guess I understood using the footage example on some of these things where I'm trying to figure out if there really is agreement. It seems like maybe there's agreement that if footage is needed to be retained, now the time is five years, but I understood the State to still be contesting whether they needed to have the footage at all, so it wasn't really an agreement. Am I misunderstanding the situation? It's not an agreement. It's the court-ordered plans, which the court did exactly what the Supreme Court instructs under the PLRA and let defendants draft their own plans, which we had an opportunity to object to and the district court had an opportunity to rule on, and as written, those plans will govern their implementation of these orders. I'm not sure that answers your question. At this point, we need to decide do we need body cameras, do we need fixed cameras, do we need footage retention, but you're saying we don't need to decide anything more than five years of footage retention. That is correct because that is what is happening and that is what the orders as modified by the plans require. And as to this reassignment issue, they may still contest that there should be any sort of reassignment policy, so we still may have that question before us? I don't think they contest that because they've always had a reassignment policy. The concern was that many of the officers who were engaged in the behavior at issue were continuing to oversee the incarcerated people with disabilities for up to a year while staff misconduct and other investigations occurred, and so there will be reassignment of some of those persons who are accused repeatedly of that according to criteria set forth in the Five Prisons Remedial Plan. So it's a slightly different policy from what they had before, but they did have a policy before, it just wasn't being implemented. And really that's what these appeals and these motions in this case are about, is systemic problems and a broken accountability system. And all the remedies, including body-worn cameras, were designed to work together to put an end to that systemic, broken accountability system. So can I ask, it seems like some of where you started your argument was about these, I think it was called the Bishop Report, the statewide analyses of problems. I'm a little bit confused about what happened. I think one prison that you moved for wasn't granted, but it seems like a lot of your evidence was statewide. So can you help us understand what happened with that one and why you didn't get relief in that one? Your Honor, there were two prisons, CCI and Salinas Valley, where relief was not granted. That's in footnote 2 of the Five Prisons Order, and the Court explained that plaintiffs had not shown systemic violations at those two prisons. As for the prisons where relief was granted, RJD and the Five Prisons, there was extensive systemic evidence. The OIG reports. But it seems like those reports were also about the other two. I just am trying to figure out, like, I don't understand why the systemic evidence didn't also apply to those other two. Our view is that it did, and we moved for relief as to all of them, and we believe that systemically there were problems at that too. But that issue has not been appealed and is not before the Court. However, it's not just the reports and the systemic evidence. Well, it is mostly the systemic evidence, but it's CompStat data, OIG reports, the two unrebutted expert reports, the depositions, the admissions, and, of course, the class member declarations, that altogether the District Court considered all of this evidence, made a decision to impose relief at six prisons, which is not clearly erroneous, not an abuse of discretion. So I did want to address one issue from earlier, though. The District Court did not hold that Coleman class members are Armstrong class members. The District Court looked at the evidence and concluded that those individuals are similarly situated. They are people with disabilities.  I guess I thought the District Court was saying that they're covered by the ARP, though. That is a plain language interpretation of the ARP. We call it the ARP. And it clearly applies to all qualified inmates with disabilities, mental and physical. It's Defendant's own plan to bring themselves into compliance with the ADA. But that is not necessary to this decision. That is one more reason that the court found the Coleman declarations probative evidence of like-minded groups. So that issue, I believe, is just an evidentiary issue. So I take the point that the treatment of people outside of the plaintiff class can be probative of what's happening to the plaintiff class. But I thought that as I read the PLRA findings in the order, the court, when saying that the remedy was necessary to correct the violation of a federal right, spoke of the violations of the federal right for people with disabilities writ large, which is more than just the plaintiffs. Is that your understanding of what the District Court was saying? My understanding is that the District Court found these remedies ordered here in these two orders to meet the PLRA because they will bring defendants into compliance for the Armstrong class. So the evidence of disabled inmates, of other people with disabilities, was probative to finding that there was sufficient systemic evidence of systemic problems here, which is what we have here in this case. But I thought the court spoke in terms of, I mean, I guess if you're right, and I think you are, that the ARP reaches more broadly than just the plaintiffs. I guess it's not clear to me how preventing a violation of the ARP  because you could, in principle, violate the ARP in ways that affected only non-plaintiffs. And if that were the case, then preventing that from happening doesn't seem like it would satisfy the narrow tailoring requirement of the statute. Or am I missing something? Well, the ARP, parts of it have been court ordered. That's the 2007 order. And, of course, as this court knows, under Brown v. Plata, relief can help more than the class and still be narrowly tailored. And in this case it was because it is going to reach this accountability system that is ordered in 2012, affirmed by this court in 2014, which is the only way defendants are going to come into compliance with the ADA with respect to the Armstrong class, is if they can begin to hold themselves accountable for these violations. Right. But so, I mean, it's okay for the relief to help more than just the class, but the narrow tailoring that is required is that it has to be narrowly tailored to help the plaintiffs. Do you agree with that? Yes, Your Honor, and it was. And all of these remedies work together to, again, fix this broken accountability system. So maybe I have a slightly different way of thinking about this, but I've been thinking about this sort of like a house of cards. So we start with the complaint, which is about the Armstrong class. Then we get this ARP order, which maybe is broader, but if we at this point have to take that as given because it wasn't appealed and they haven't tried to move to lift it or anything, if it is broader, do we just take an assumption that everything in the ARP is needed for the Armstrong class because no one said it wasn't? And now we're looking at violations of the ARP. And so maybe there's a problem in the middle of the house of cards, but no one is challenging that right now. And so at that point, we get the relief? Does that make sense as a way to think about this, or are you thinking about it differently? I think about it slightly differently. First of all, the entire ARP is not court-ordered and is not involved in this appeal. It's a lengthy document that addresses many, many issues. But the part that was court-ordered was the requirement to have accountability, to have a grievance process, and those violations were at issue directly here. Right, okay, so that would be my second layer then. The part that was court-ordered of the ARP that you just listed would be the middle of the house of cards. And then on top of that now would be if you're violating that middle layer, you get more remedies to stop you from violating it, but we take as given that that's how high the house is at this point. Is that still not right? That's one way to look at it. The district court clearly was trying to enforce not only the 2007 order, but also the 2012 order, which states that we're going to have this system for bringing you into compliance. You are going to track allegations of disability discrimination, denials of grievances, all of the things that were documented here, and then you're going to investigate, and then you're going to hold people accountable. And that was found to be irretrievably broken, and there's no clear error on those findings here. And, by the way, it simply cannot be the case that the district court has authority to restrict violations of the ADA gently, but cannot do so when they are accomplished through violence. So all of these together are part of the complaint, the 2007 order, the 2012 order affirmed in 2014, and they will all work together to fix the broken accountability system. Could you address the order for increase in staffing? The court seemed to rely primarily on the Bishop report there, but the Bishop report wasn't clear to me what the rationale in the Bishop report was for recommending that. So what's the theory by which that will contribute to remedying the violation? The court relied on the Bishop report with respect to R.J. Donovan and Mr. Vail with respect to the five prisons. He recommended additional supervisorial and non-uniform staff, a reform that the court rejected. But for the uniform staff, cameras alone cannot fix these problems. Staff are needed to mentor, train, interact, oversee, and most importantly, de-escalate situations. So those additional staff, which of course were not the remedial plan, calls for less staff than the order, but those will be and are a very important part of this remedy designed to, again, bring defendants into compliance and reduce the amount of disability discrimination. I guess your position is that some redundancy is not fatal here, but insofar as you mentioned training as one of the things the staff can do, there are fairly detailed training requirements already, so at least with respect to that part of it, why shouldn't it be left up to the state? If they need to hire more staff for training, they can do that, but that doesn't seem like it's a reason independently to order them to hire more staff. District court looked at all of the evidence, the OIG, the expert reports, the declarations and defendants' own admissions and concluded that all of these remedies would work together and were necessary. Yes, there was some training before, although the record doesn't reflect what kind, but as of the time the district court issued the R.J. Donovan order, it was clear that none of the efforts at reform were working. The court had to transfer two individuals out of R.J. Donovan who were witnesses in this case. There were ongoing reports of violation and abuse. The training that was being done was not working. The amount of staff was not working. There's no clear error in those findings, and the staff have been deployed, but in lesser amounts than the order. They have been deployed according to the remedial plans. So all of these are working together to change the behavior. If there are no further questions, I would thank the court and urge affirmance, especially given that the district court has been overseeing this case for many years and prior less intrusive remedies have clearly failed. Thank you. Thank you. Do you have some time for rebuttal? Sorry? Do you have time for rebuttal? Thank you. Could you maybe start out by clarifying? There was discussion of the fact that there's been this change in what the remedies are. So what is it that you've agreed to at this point? What is it that you're already doing, and what's still in dispute? So the problem is with the remedies that were changed in process of this litigation after the appeal was taken was that defendants still object to the fact that they are properly included in this litigation and that the court should have been directing them at such a specific level. Now, plaintiffs have admitted that they were overbroad and unnecessary because they agreed to less in the district court while this litigation was ongoing. So what we've seen is that the district court overstepped. There's been no showing that the narrow remedy that defendants were then forced into, which has now evaded judicial review because it was changed while this appeal was ongoing and while jurisdiction had come to this court. So there's no showing there that that sort of interference is necessary. Well, counsel, if we hold the plaintiffs to that, then why isn't the plan an admission that everything that is in it is necessary from your client's perspective? Well, our clients have objected throughout to the remedies, and we've talked about how they are duplicative not only to what CDCR had in place but duplicative to each other. And the district court did some broad misreadings where it said the Bishop report had recommended extra staffing, and the Bishop report didn't. It recommended an increased supervisory presence, which CDCR did before the injunction was sought. CDCR made high-level staffing changes to its employees. It adjusted assignments and yard releases so that there was more staff observing the inmates. It brought outside staff in to mentor and train and supervise, investigate, set expectations. We're going to use up your time, but let me just, if we assume that we disagree with you about whether some remedies could be granted, so let's just, I know you don't agree with that, but let's just say that the district court could add remedies. At this point, should we be looking for, say, the video retention at indefinite, or should we be looking at five years? At five years since plaintiffs have already agreed that indefinite is unnecessary. And how about as to this reassignment issue? Like, how should we understand what we're reviewing at this point? The district court is still directing the terms of reassignment, and rather than letting CDCR make its own determinations with oversight, it's setting forth, according to plaintiffs' own statements here today, setting forth the details of what has to be considered and what has to be done. And again, that's inappropriate. It should be the prison wardens and prison administrators who are equipped to deal with these decisions taking them on in the first instance. So I want to be sure I understand that. You're saying that even the narrower provisions that are in the plan, you still object to and we should be looking, but should we be looking at those narrower provisions or at the broader provisions? Well, that's where it's difficult, Your Honor, because when this appeal was taken, it took jurisdiction from the district court to approve the order. I'm just asking what we should, what your view is we should be looking at. A or B? To the extent this court feels that the changes that were made during the litigation, during this appeal stand, then we would look at B, the narrower provisions. Okay. Are there other? So we've talked about the retention and the reassignment. Are there other things that have relevantly changed? For example, the pepper spray, is that applicable to all of the prisons, all five plus RJD, or has that been narrowed to the facilities where that? Pepper spray reforms were required at RJD and the five prisons. And has anything changed about that? Not that I'm aware of, Your Honor. I mean, I know they were negotiating for two years over what that would be. However, they did still require pepper spray reforms, even if the prisons where no pepper spray misuse was cited. And one thing I wanted to comment on with respect to the inclusion of the Coleman class members, expansion of the Armstrong remedial plan, the problem with that was that the district court did it after briefing was submitted, and in that same order, and then faulted defendant's experts for not looking at the, focusing on those statements enough. So there was a notice issue, too, where defendants didn't have a fair opportunity to know that these statements were going to carry extra weight and address them on those grounds. The district court went beyond what was needed, necessary, and they didn't narrowly tailor the remedies. As I said, we have cameras, fixed cameras, and blanket-worn cameras. They're entitled to a constitutional minimum, not every remedy that might help. And so to the extent that the plaintiff's counsel is saying only body-worn cameras provide these extra things, they could have limited the remedy to body-worn cameras. They could have limited it to fixed cameras and seen what that did. We already saw demonstrated reductions in uses of force through CDCR's self-directed reforms. And I see that I'm out of time, so we would ask the district court to reverse the injunctions at RJD and the five prisons. Thank you to both sides for the helpful arguments in this complicated case. We appreciate it. The case is submitted, and we are adjourned for the day.
judges: GRABER, FRIEDLAND, MILLER